## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **REYES P.,** | **Civil Action No.  20-3686 (MCA)** |
| **Petitioner,** | |
| **v.** | **MEMORANDUM OPINION** |
| **RON EDWARDS, et. al,** | |
| **Respondents.** | |

This matter having been opened to the Court by Petitioners' filing of a Verified Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 seeking immediate release in light of the novel coronavirus ("COVID-19") pandemic. For the reasons explained in this Memorandum Opinion, the Court has considered the parties' arguments and the relevant record and will deny without prejudice the motion for immediate release because Petitioner has not made the required showing.

## I.    FACTUAL BACKGROUND

### a.  Petitioner's Immigration History and Proceedings

Petitioner Reyes P. is a 45 year-old native and citizen of El Salvador. *See* Ex. A, Notice to Appear ("NTA"). Petitioner asserts that he has resided in the United States since 1999. Pet., ¶1. On March 8, 2001, Petitioner was voluntarily returned to Mexico from the United States after he claimed to be Mexican. *See* Ex. B, Form I-213, Record of Deportable/Inadmissible Alien dated March 11, 2013. On an unknown date and at an unknown place, Petitioner re-entered the United States. Petitioner filed an application for Temporary Protected Status ("TPS"). Ex. B. On January 7, 2004, his TPS application was denied. *Id.*

On or about March 11, 2013, ICE issued a Notice to Appear in removal proceedings charging Petitioner with being removable under Section 212(a)(6)(A)(i) of the Immigration and Nationality Act as alien present in the United States without inspection. Ex. A, Notice to Appear. On March 26, 2013, ICE released Petitioner under a $7,000.00 bond. Ex. D, I-213 Narrative 1 created 01/10/2020.

On February 6, 2019, an immigration judge ("IJ") denied Petitioner's applications for asylum and withholding of removal. Ex. E, Order of the IJ dated February 6, 2019. The IJ ordered Petitioner removed from the United States to El Salvador. *Id.* Petitioner appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). Pet., ¶ 3. Petitioner's appeal to the BIA is still pending. On December 18, 2019, the Nassau County Police Department arrested Petitioner. Petitioner was charged with violating NYPL 130.65(3). That felony charge pertains to sexual abuse in the first degree involving sexual contact with an individual less than eleven years old. *See* Ex. F, Felony Complaint.

On or about January 9, 2020, Petitioner posted bail on the criminal charge in the amount of $10,000.00, and the Nassau County Police Department released him. Pet. ¶ 23. Petitioner asserts that the sexual abuse charge against him will likely be dismissed. Pet. ¶ 1. As of April 8, 2020, the charge is still pending. Ex. G, Second Aff. of Matin Emouna, Esq., dated April 8, 2020 at 2. The next proceeding in the criminal case has been adjourned to May 7, 2020. *Id.*

Petitioner was taken into ICE custody pursuant to a warrant on January 10, 2020 outside of the Nassau County Correctional Center ("NCCC").  Pet. ¶ 23; ECF No. 5-2, Ex. D, I-213 Narrative 1 created 01/10/2020. Petitioner claimed to be in good health, and he was not taking any prescribed medication. *See* Ex. D.

### b.  The Allegations in the Petition

Petitioner is detained at the Hudson County Correctional Center ("HCCC"), Pet. at ¶ 4, pursuant to 8 U.S.C. § 1226(a). *See* Ex. A. On April 6, 2020, Petitioner filed the instant Petition seeking his immediate release from custody and asserting his continued detention at Hudson County Correctional Facility violates his due process rights in light of the current COVID-19 pandemic and the heightened risk that he will contract the virus in jail. Pet. at ¶¶ 44-48.

According to the Petition, on March 18, 2020, Petitioner's defense counsel wrote a letter to HCCC stating that Petitioner had been urinating blood and had a high fever, and efforts to inform the authorities had "fallen on deaf ears." Petitioner's defense counsel requested that Petitioner be treated for this condition by a physician. *See* Pet. at ¶ 2. A letter written by Petitioner's defense attorney indicates that the attorney had a conversation with Ms. Portwinck of Wellpath regarding Petitioner's health. *See* ECF No. 1-1 at 29. Petitioner asserts that "[h]is safety is in jeopardy due to his rapidly declining health."  *Id.* at ¶ 26.

The Petition identifies the New York metropolitan region as the epicenter of the COVID-19 outbreak in the United States.[1] *See* Petition ¶ 27. The Petition further asserts that "the health risks presented by this novel and virulent pandemic affect all segments of the population" and that "New York City's latest statistics show that men between the ages of eighteen and forty-nine represent the majority of those who have tested positive for the coronavirus, and that overall, men are more than twice as likely as women to die from contracting the virus."[2] ¶ 28.

---

[1] As of May 8, 2020, New York and New Jersey have the greatest number of infections and deaths in the nation, with New Jersey reporting a total of 133,635 cases and 8,801 deaths as of May 8, 2020. *See New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited May 8, 2020).

[2] The Petition cites to the 2020 Advisory #8 COVID-19 Update for New York City, N.Y. CITY DEP'T OF HEALTH AND MENTAL HYGIENE, (Mar. 20, 2020), available at https://www1.nyc.gov/assets/doh/downloads/pdf/han/advisory/2020/covid-19-03202020.pdf & Ebony Bowden & Bob Fredericks, Men twice as likely to die from coronavirus as women, expert says, N.Y. POST (Mar. 20, 2020),

The Petition points out that there is presently no vaccine to prevent COVID-19 infections, *id.* ¶ 28, and that the CDC and health experts emphasize the importance of "social distancing" (i.e. staying at least six feet apart) and adequate hygiene; Petitioner asserts that the social distancing and hygiene measures necessary to combat the spread of COVID-19 are impossible in a carceral setting like HCCC. *See id.* ¶¶ 29-36. The Petition argues that "HCC[C] is akin to a cruise ship: lacking the basic necessities of sufficient soap, packed with up to sixty people in a single open dormitory in stacked bunk beds—a ticking time bomb of a health catastrophe." *Id.* ¶ 5.

Petitioner further asserts that the COVID-19 restrictions instituted at HCCC violate his right to meaningful access to his counsel under the Fifth Amendment and the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1229a(b)(4)(A). Pet. at ¶¶ 49-53. With regard to this claim, Petitioner asserts that his attorney is unable to visit him at HCCC due to the pandemic and stay at home order issued by the State of New York on March 20, 2020. *Id.* at ¶¶ 40-41. Furthermore, HCCC only permits private calls to landlines and his attorney's office is closed due to the pandemic and his attorney does not have a landline. Pet. at ¶¶ 41-42. Petitioner argues that the restrictions on communication with detainees and the logistical burden of remote coordination makes scheduling even non-private calls impossible. *Id.* at ¶ 43.

Petitioner seeks only his immediate release from immigration custody. *Id.* at 18. The Petition does <u>not</u> seek a bond hearing pursuant to §1226(a). *See id.*

### c.  Respondents' Answer to the Petition

On April 7, 2020, the Court directed Respondents to answer the Petition on an expedited schedule. Respondents filed their Answer on April 10, 2020. ECF No. 5.

---

https://nypost.com/2020/03/20/men-twice-as-likely-to-die-from-coronavirus-than-women-expert-says/ (March 20, 2020).  The Court considers these allegations in Discussion section of the Opinion.

In its guidance for correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *See* ECF No. 5-3, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2.

As set forth in the Declaration of Director Edwards, HCCC has taken various measures to address the spread of COVID-19 in the facility. Although HCCC is still accepting ICE detainees, detainees, inmates, vendors, and staff are subject to medical evaluations before entering the Facility. Edwards Decl. ¶¶ 12.B.i., 12.B.ii., 12.B.vii. HCCC has suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys. Edwards Decl. ¶¶ 12.D.i, 12.H.-J.

Nevertheless, for attorney visits, web-based video visitation is available free of charge. *Id.* at ¶ 12.D.i. *Id.* Non-contact visitation where attorney and detainee/inmates meet are separated by a glass partition is also available. *Id.* Visiting areas are cleaned and sanitized after each visit. *Id.* HCCC also facilitates confidential telephone calls between detainees and inmates and their attorneys. *Id.* at ¶ 12.D.j. Attorneys may also contact the Inmate/Detainee Advocate to arrange for a telephone call with their client. *Id.* The inmate or detainee can use headphones while speaking with their attorney. *Id.*

To address COVID-19, the Hudson County Facility has also implemented a "[r]estrictive schedule," permitting one "tier . . . out in the morning and the other portion . . . out in the afternoon, rotating daily." Edwards Decl. ¶ 11. As a social distancing measure, beginning on March 21, 2020, the "recreation period" is now staggered to permit only two "inmates/detainees" to leave their cells for a thirty-minute recreational-use period. *Id.* ¶ 12.K. Detainees have meals inside their cells to

prevent congregation. *See id.* ¶¶ 12.E, 13.E. With respect to cleaning and hygiene, HCCC "lock[s] down" each housing unit in between shifts for cleaning and sanitization, which occurs, at a minimum, three times per day. *See id.* ¶¶ 11, 12.E. HCCC also reports that it cleans the recreation areas "constantly" each day, *id.* ¶ 12.K, but does not state when, how often, and what that cleaning entails. It has also provided its staff with Personal Protective Equipment ("PPE"). *Id.* ¶ 13.C. *See id.* ¶ 12.D.iv.

With respect to medical care, HCCC has an on-site physician who is on-call 24/7 for emergencies and additional Hudson County medical staff, including RNs and LPNs, are also on-site 24/7 to provide additional coverage for detainee/inmate medical needs. *Id.* ¶ 7. If detainees or inmates complain of illness, medical staff are instructed to evaluate them. *Id.* ¶ 14. Those who present with COVID-19 symptoms are provided a "surgical mask." *Id.* HCCC also uses some form of COVID-19 testing on inmates, *id.* ¶ 15, but the criteria for testing is unclear.

Confirmed cases of COVID-19 that do not require hospitalization are isolated in a designated area. *Id.* ¶ 15. Symptomatic inmates or detainees who are awaiting test results are quarantined. *Id.* ¶ 16. Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for fourteen-day period. *Id.* ¶ 17. Cohorting ends if no new COVID-19 case develops within that period. *Id.*

### d.  Status Update Re: Petitioner's Current Health Status and Bond Hearing

Petitioner did not submit a reply responding to the sufficiency of the protocols at HCCC related to reducing the spread of COVID-19, accessing medical care, or facilitating attorney/client communication during the pandemic. Because Petitioner's current health status was unknown, the

Court directed the parties to provide a status update on this issue and instructed Petitioner to tell the Court whether he had sought a bond hearing. *See* ECF No. 7.

On April 24, 2020, Petitioner submitted a declaration through his counsel about his current health status, stating that he was experiencing chest pain and numbness in his right arm and leg, and was taken to the emergency room on or about April 16, 2020. ECF No. 8, Petitioner's Decl. at ¶¶ 4-6. Petitioner further states that he was admitted to the hospital and was treated with medicine and released the following day, but has continued to feel sick. *Id.* at ¶¶ 7-8. Petitioner also states that within the last few days, he has had a cough and fatigue, and on the morning of April 24, 2020, he had a stomachache and vomited five times and also experienced heaviness in his chest. *Id.* at ¶¶ 10-13. Petitioner is fearful that he has COVID-19. *Id.* at ¶¶ 14-15.

In the status update, Respondents provided Petitioner's medical records from his approximately four-month detention at HCCC, which the Court summarizes in relevant part below. *See* ECF No. 9.

On March 17, 2020, Petitioner submitted a medical call slip because he was urinating blood. *See* 9-1, Ex. A at 104. On March 18, 2020, Petitioner was treated for hematuria and a urinalysis was sent to the lab for analysis. *Id.* at 96-98. On March 20, 2020, the nurse practitioner entered a note stating she had treated Petitioner for hematuria, but through an interpreter, Petitioner stated he no longer had hematuria.[3] *Id.* at 95. On that date, Petitioner also complained of intermittent pain in his left lower abdomen but denied nausea, vomiting, fever, chest pain or shortness of breath. *Id.* The treatment notes state "Possible Dyspepsia", and Petitioner was provided with Motrin and Maalox. *Id.* at 96.

---

[3] A urinalysis dated April 16, 2020 showed a normal result.  *Id.* at 66.

On April 3, 2020, Petitioner sought medical care at HCCC for complaints of cough, sore throat, and loss of taste and smell.[4] *Id.* at 85-86. His vital signs were normal, *id.*, and there are no additional records regarding these medical complaints.

Consistent with Petitioner's declaration, on April 16, 2020, Petitioner sought emergency care for chest pains experienced in his cell at HCCC.  *See* Ex. A at 23-27, 52-69, 77, 90-93. It appears that he was treated prophylactically with nitroglycerine at HCCC and transferred to the emergency  department at RWJ Barnabas Jersey City Medical Center. *Id.* at 26. The hospital conducted various tests, concluded that Petitioner was experiencing "nonspecific chest pain," and returned him to HCCC for follow-up with primary care. *Id.* at 52-69. Upon his return, HCCC noted that his tests from the hospital were normal. *Id.* at 90.

On April 25, 2020, Petitioner was seen at HCCC for mental health concerns including depression and anxiety resulting in loss of sleep. Ex. A at 7-12, 76. Petitioner reported that his son, father-in-law, and other family members died of COVID-19; his wife had the COVID-19 infection; and his home neighborhood is a COVID-19 hotspot. He was prescribed Vistaril and referred for behavioral health services.

Finally, Petitioner's status update contains no information about whether Petitioner has sought a bond hearing, *see* ECF No. 8, and ICE has no information in its electronic records that Petitioner has sought a bond hearing or that an Immigration Judge has scheduled one. ECF No. 9, Res. Update at 3.

---

[4] The Court addresses these symptoms, which are consistent with the symptoms of COVID-19 infection, in the analysis section of the Opinion. *See infra* note 10. Petitioner was also treated for a sore throat, runny nose, cough, and fever in late January 2020. Ex. A at 71; 102-103. A note from January 30, 2020, indicates that Petitioner's condition had improved. *Id.* at 100.

## II.   **STANDARD OF REVIEW**

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).

Petitioner's counsel did not file a separate motion for a Temporary Restraining Order ("TRO") or preliminary injunction pursuant to Fed R. Civ. P. 65, but the Court construes the request for immediate release, *see* Petition at 18, as a request for a preliminary injunction. *See Hope v. Warden York County Prison*, 2020 WL 1922372, at *2-4  (3d Cir. Apr. 21, 2020).

Motions for temporary and preliminary injunctive relief are governed by a four-factor test. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "[he or she] can win on the merits." *Id.* This showing must be "significantly better than negligible but not necessarily more likely than not." *Id.* The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief.  *Id.* If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. *Id.* at 176, 179. The Court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. *Id.* at 179.

The Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) also establishes that "extraordinary circumstances" are required before "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition." *Id.* at 367. Citing *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), the Third Circuit in *Lucas* noted that extraordinary circumstances may be

9

established where the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill. *Id.* at 366-67. Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

## III.    DISCUSSION

The Court begins by noting that Petitioner is detained pursuant to 8 U.S.C. § 1226(a). "Section 1226 vests the Attorney General ("AG") with statutory authority to detain aliens in removal proceedings before the issuance of a final order of removal, e.g., during the 'pre-removal' period. In that respect, § 1226(a) specifically authorizes the AG to detain or release an alien pending a decision on whether the alien is to be removed from the United States." *German B. A. v. Ahrendt*, No. CV 18-17579 (JMV), 2019 WL 3562091, at *2 (D.N.J. Aug. 6, 2019). "Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *See Jennings v. Rodriguez*, 138 S.Ct. 830, 847 (2018) (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)).  Under § 1226(a), aliens may request an initial bond redetermination hearing by making an oral, written or telephonic request to the immigration court. *See* 8 C.F.R. § 1003.19(b). The regulations also provide procedures for requesting a subsequent bond redetermination hearing after an initial bond determination.  *See* 8 C.F.R. § 1003.19(e).

Here, Petitioner seeks only release from detention and does not assert that he has been denied his right to a timely initial bond hearing (or bond redetermination hearing) before an

immigration judge, and it is unclear if he requested and received an initial bond hearing from an immigration judge.

Instead, Petitioner argues that his ongoing confinement in a facility where his is likely to contract COVID-19, is unlikely to receive adequate medical care, and is unable to meaningfully consult with his immigration attorney support the conclusion that his continued detention violates due process and that he is entitled to immediate release. Pet. at ¶¶ 44-48. Petitioner further argues that his continued detention violates his statutory and constitutional right to counsel. Pet. at ¶¶ 49-53. The Court addresses these allegations, beginning with the heightened risk of contracting COVID-19 at HCCC.

Within the last six weeks, district courts and courts of appeals throughout the nation, including this Court, have addressed immigration detainees and inmates COVID-19 related claims. The courts that have released immigration detainees gave considerable weight to the detainee's underlying health conditions and/or advanced age that put them at higher risk for severe illness or death if they were to contract COVID-19. *See Rafael L.O.  v. Tsoukaris*, No. 20-3481, ECF No. 25 (D.N.J. April 9, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563  (M.D. Pa. Mar. 31, 2020); *Jeferson V. G. v. Decker*, No. 20-3644, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Marvin A. G. v. Decker*, No. 20-1689 (D.N.J. Apr. 14, 2020); *Kevin M.A. v. Decker*, No. 20-4593, 2020 WL 2092791, at *10 (D.N.J. May 1, 2020). Indeed, this Court recently ordered the release of immigration detainees at HCCC (and Bergen County Jail) who have medical conditions that place them at risk of severe illness or death if they contract COVID-19 <u>and</u> where conditions of release could reasonably ensure that the detainee will not flee or present a danger to the community. *See Cristian A.R. v. Decker*, Civ. No. 20-3600 (MCA) (D.N.J. Apr. 12, 2020); *see also Asmed B. v. Decker*, Civ. No. 20-3734 (MCA) (D.N.J. Apr. 30, 2020). In ordering the release of medically

vulnerable detainees, this Court acknowledged that HCCC and Bergen County Jail had taken measures to address the pandemic within their respective facilities but had not taken sufficient measures to protect "<u>the most vulnerable people within their care</u>." *See id.* at 22.

In contrast, Courts in this district and elsewhere have denied relief from detention where the record shows that the individual petitioner is not particularly vulnerable to severe illness due to age or an underlying medical condition.[5] *See Ousman D. v. Decker*, 2020 WL 1847704, at *10 (D.N.J. 2020) (denying immediate release to petitioner who had no particular medical vulnerability to COVID-19); *see also Emerson O. C.-S. v. Anderson*, Civ. No. 20-3774 (JMV), 2020 WL 1933992, at *6 (D.N.J. Apr. 22, 2020) (finding that petitioner's medical condition is critical to the analysis but his "age and the absence of any indicia of an underlying health condition do not support the notion that he may be particularly susceptible to the virus or any severe illness stemming from contracting it"); *Buleishvili v. Hoover*, Civ. No. 20-607, 2020 WL 1911507, at *6 (M.D. Pa. Apr. 20, 2020) (considering fact that 44 year old petitioner did not present any evidence to suggest his medical condition "makes him uniquely susceptible to either contracting the virus or experience severe complications from the disease" in determining whether his conditions of confinement amounted to punishment).

Drawing that line is not easy, and the Court acknowledges that younger people with no known co-morbidities have contracted COVID-19 and even died from COVID-19. Petitioner suggests that all segments of the population are at risk of severe illness or death from COVID-19, and men in his age range are particularly hard hit by the virus. The CDC advises that "[p]eople with COVID-19 have had a wide range of symptoms reported – ranging from mild symptoms to

---

[5] *See* Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html  (last visited May 7, 2020).

severe illness", and has <u>not</u> advised that men between the ages of eighteen and forty-nine are higher risk for severe illness or death if they contract COVID-19.[6] Instead, the CDC identifies persons who are "older," are immunocompromised, or who have underlying health issues such as asthma, chronic lung disease, HIV, heart conditions, diabetes, chronic kidney disease, and liver disease as people who may be at higher risk of severe illness if they contract COVID-19.[7]

Moreover, although far from perfect, Respondents have taken some measures to address the spread of COVID-19 at HCCC. This Court found in *Cristian A.R.* that HCCC did not ensure protection for the most vulnerable detainees in its care, but that does not mean that the conditions at HCCC amount to punishment as to all detainees. For these reasons, Petitioner's circumstances are distinguishable from the Petitioners in *Cristian A.R.*, and Petitioner in this action has not shown a likelihood of success on his constitutional claim that his detention amounts to punishment or that he will be irreparably harmed absent a court order directing his release from immigration detention.[8]

---

[6] Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus,* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 8, 2020).

[7] *See* Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 8, 2020).  The Court cites to these conditions as examples only and makes no determination about the types of conditions that could support a claim for relief.

[8] Even if the Court were to find that Petitioner could establish the first two prongs of the preliminary injunction analysis, "[b]efore granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merch Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted). Here, the Court would need to balance the equities and find that the conditions of release could reasonably ensure that petitioner would not flee or present a danger to the community. *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at 27. The Court notes that Petitioner has pending felony charges for violating NYPL 130.65(3) which pertains to sexual abuse in the first degree involving sexual contact with an individual less than eleven years old. *See* Ex. F, Felony Complaint. His lawyer has suggested that these charges may be dismissed. If this significant development occurs, that fact might tip the equities in favor of release.

Nor has Petitioner shown a likelihood of success on the merits of his claim that Respondents have ignored his medical needs or denied him adequate medical care.[9] Unlike the Petitioners in *Cristian A.R.*, No. 20-3600, ECF No. 26 at 24, Petitioner has received medical treatment for his recent medical issues, as documented in the medical records provided by Respondents. Petitioner has provided no evidence that his medical needs have been ignored by HCCC or that medical treatment has been seriously delayed or otherwise inadequate.[10]

Finally, Petitioner does not have a likelihood of success on his claim that he has been denied meaningful access to counsel during the COVID-19 pandemic. Respondents have provided the Court with HCCC's protocols for continuing to ensure attorney/client communication during the COVID-19 pandemic, and Petitioner's inability to communicate with his attorney appears to largely due to his counsel's lack of a land line and not due to any fault of HCCC. Furthermore, Petitioner's difficulties communicating with counsel, standing alone or in connection with his recent health issues, are not extraordinary or exceptional circumstances which make the grant of bail necessary to make the habeas remedy effective. *See Landin*, 970 F.2d at 1239.

For these reasons, Petitioner's cannot show a likelihood of success on the merits of his Fifth Amendment or statutory claims or that he will be irreparably harmed if he is not granted

---

[9] Civil detainees also have a constitutional right to adequate health care, and such claims are governed by the deliberate indifference standard. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004) (detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm).

[10] Some of the recent symptoms reported by Petitioner, especially loss of taste and smell, are consistent with the Covid-19 illness. If Petitioner presently has COVID-19, that factor may militate against his release. *See Derron B. v. Tsoukaris*, No. 20-3679, 2020 WL 2079300, at *7 (D.N.J. Apr. 30, 2020) ("Yet, once a detainee tests positive, the public … has an interest in not introducing additional cases into the general public. Once a detainee tests positive, in the Court's view, the critical question is whether the detainee is receiving constitutionally adequate care. As a result, once a detainee tests positive, the Court does not order release but instead remains available on short notice to address any issues that may arise as to adequacy of medical care."). To the extent Petitioner is positive, the Court is available on an emergent basis to address the adequacy of his care. *See id.* at 11 n.16.

immediate release, and his request for immediate release based on the COVID-19 pandemic is denied without prejudice.[11] An appropriate Order follows.


Dated:  May 13, 2020                          **_/s Madeline Cox Arleo_**
                                              **Hon. Madeline Cox Arleo**
                                              **UNITED STATES DISTRICT JUDGE**

---

[11] The Court recognizes that the COVID-19 health crisis is an evolving situation.  Should Petitioner circumstances or the conditions at HCCC change, Petitioner may file a new petition.